**J & H GIBBAR CONSTRUCTION CO., INC., Appellant,**

v.

**Burton and Edna ADAMS, et al., Respondents.**

No. 52693.

Missouri Court of Appeals, Eastern District, Division Five.

April 12, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 16, 1988.

Bernard A. Reinert, Leritz, Reinert & Duree, P.C., St. Louis, for appellant.

Rush H. Limbaugh, Sr., R. Michael Howard, Limbaugh, Russell & Syler, Cape Girardeau, Paul W. Hahn, Marble Hill, for respondents.

CARL R. GAERTNER, Judge.

Plaintiff instituted this action against the City of St. Mary, Missouri, and several hundred owners of private property in the City. In Count I plaintiff seeks to impress a mechanic's lien upon private property adjacent to a sewer line pursuant to section 429.020, RSMo.1986. In Counts II and III, plaintiff seeks a money judgment against the City of St. Mary for alleged breach of contract or on the theory of quantum meruit[1]. The trial court sustained defendants' motions for summary judgment and to dis-

**1.** Plaintiff voluntarily dismissed a fourth count alleging tortious interference with contract.

miss the three counts. Plaintiff appeals; we affirm.

On October 27, 1983, the City of St. Mary, a municipal corporation, (the City) contracted with J. & H. Gibbar Construction Company, Inc., (Gibbar) to construct a sewer system for the City. The funds to construct the sewer system came from three sources: The federal government, through the Environmental Protection Agency (EPA), provided a $1,256,490 grant under the Federal Clean Water Act, 33 U.S.C. § 1281 (1982); the State of Missouri, through the Department of Natural Resources (DNR), provided a grant of $147,370 under the Missouri Clean Water Act, § 644.101, RSMo.1986; and, the Farmer's Home Authority (FHA) purchased a city bond issue, backed by future revenues from the project, for the sum of $124,000. The system was scheduled to be completed by December 7, 1984. On August 14, 1985, after Gibbar had received over $900,000 in payments, the project was still unfinished and the City terminated Gibbar as contractor for the project. Gibbar claims the City still owed it $261,799.61 for labor and materials.

On December 21, 1985, Gibbar sent mechanic's lien notices, § 429.012, RSMo.1986, to 228 property owners in St. Marys. On February 13, 1986, Gibbar filed mechanic's liens against the property owners and on August 7, 1986, Gibbar filed the action to enforce those liens. Plaintiff filed its first amended petition on September 16, 1986, adding the breach of contract and quantum meruit counts against the City. The property owners filed motions to dismiss Count I on the ground, inter alia, that a contractor cannot assert a mechanic's lien on private property for labor and materials furnished for public improvements. The City filed motions to dismiss Counts II and III on the ground that a previously filed suit between the same parties for the same purpose was pending in the Circuit Court of St. Louis County.

Initially we address plaintiff's contention on appeal that the trial court erred in entering its order of dismissal because of "the appearance of impropriety in that defendant's counsel had several *ex parte* communications with the trial court." Some background is necessary to understand plaintiff's contention.

This action was instituted in the Circuit Court of Ste. Genevieve County and came before the Honorable Stanley Murphy, Judge of the 24th Judicial Circuit. On September 2, 1986, in the midst of a motion hearing, after Judge Murphy had expressed a tentative opinion regarding a matter of law, plaintiff's attorney orally requested a change of judge. This request was immediately granted and the case was assigned to the other Circuit Judge of the 24th Circuit, the Honorable Kenneth W. Pratte. Plaintiff's attorney subsequently filed a motion to disqualify Judge Pratte under Rule 51.07, alleging a familial relationship between the judge and one of the defendant property owners whose maiden name was Pratte. This motion, among others, was taken up on September 16, 1986. It was established that if this defendant and the judge were related, the relationship was so distant neither one of them was aware of it. Plaintiff's attorney then orally asked Judge Pratte to disqualify himself. Plaintiff based this request on "the appearance of impropriety" in a September 8, 1986 correspondence between defendants' attorney and Judge Pratte. The attorney had mailed Judge Pratte, whose circuit includes five counties, copies of the pleadings on file in the circuit court at Ste. Genevieve, but had neglected to send a copy of the cover letter to plaintiff's attorney. The September 8 letter is not before us, but the record reflects nothing more than the writer's intention to provide Judge Pratte with an opportunity to review the motions, memoranda and affidavits on file before traveling to Ste. Genevieve for the September 16 hearing. Judge Pratte found no impropriety and denied the requested recusal.

Subsequently, Judge Pratte granted a change of judge motion made by one of the defendants. In response to a request for a transfer of a judge pursuant to Rule 51.05(e)(2), the Supreme Court appointed the Honorable A. J. Seier, Presiding Judge of the 32nd Judicial Circuit, on November

12, 1986. Judge Seier heard arguments on the motions to dismiss on December 1, 1986, and sustained the motions in his December 12, 1986 order. He did not rule at that time upon a defendant's motion for sanctions under Rule 55.03. This motion was taken up on January 9, 1987. At this hearing, plaintiff's attorney noted several entries in defense counsel's time records relating to communications between the attorney and Judge Seier. Defendants' attorney, testifying under oath, explained each of the entries. Upon learning of Judge Seier's appointment, he had written a letter to the judge to request the matter be scheduled for a hearing. In response, Judge Seier called defendants' attorney and discussed possible dates for the hearing, subject to the availability of plaintiff's attorney. A December 1 entry recorded a conference with Judge Seier, which, defendants' attorney explained, had been attended by attorneys for all parties. The December 4 entry reflected the delivery of a proposed order to Judge Seier at the judge's request. Additional communications after the entry of the order of dismissal related to scheduling the motion for sanctions. In addition to this sworn testimony, when plaintiff's attorney suggested these communications constituted an appearance of impropriety which could be disconcerting to laymen such as his clients, Judge Seier responded:

THE COURT: If I may respond to that in the presence of your clients, Mr. Reinert. I am going to tell you that it may appear improper in the city of St. Louis for all of you to have law clerks and the bench and all the other people around.

But, we have to run our own Court. And, I can assure those folks that they are—your clients back there, that the only conference I have ever had with Mr. Limbaugh about this lawsuit has been about the setting of the case for hearing.

For their information there was a call about this motion that was initiated by you, as I understand, because we didn't know whether you were coming down here or not. And, we even returned calls to your home and to your office. That's why I was late.

But, other than that, procedural matters like when are you going to be available, or trying to find out what this notice is all about, we have never discussed the merits of this claim at all.

On January 20, 1987, plaintiff's attorney filed a motion requesting Judge Seier to vacate and set aside the prior orders and to disqualify himself. This motion alleged that "because of the ex parte conferences between defendant's counsel and court, the court has become burdened with the appearance of impropriety in the performance of its duties in this case."[2]

We have indulged in this lengthy recitation of facts in order to demonstrate that the record in its entirety dispels any reasonable question of impropriety. Although not cited by either party, we find instructive the opinions in *Berry v. Berry*, 654 S.W.2d 155 (Mo.App.1983), where Judge Dixon observed that "when the record discloses an opportunity to obtain information that would disqualify the trial judge, the record must also disclose facts that negate any reasonable question concerning the impartiality of the judge." *Id.* at 162. (Dixon, J., concurring).

*Berry* was a marriage dissolution proceeding in which the parties hotly disputed child custody. Following a hearing, the trial judge indicated his intention to award custody to the husband and requested the latter's attorney to prepare a decree. Thereafter, wife requested the judge to disqualify himself on the ground that the judge's wife was the school teacher of one of the children and had discussed the child's progress with the husband and had social contact with him at school events. Wife's attorney expressed the suspicion that the judge may have received information from his wife which might have a bearing upon the decision. The judge stated on the record that he had been unaware

---

**2.** The legal file fails to indicate a ruling upon this motion or upon plaintiff's motion for sanctions. We assume both were denied.

of the fact that the child was in his wife's class until the motion was filed. The judge refused to disqualify himself, quashed a subpoena which had been served upon his wife, and refused to hold a hearing on the matter.

The Western District found no error or abuse of discretion. The four judge majority noted that the basis for the requested disqualification was nothing more than the existence of a "mere opportunity to have received outside-the-courtroom potentially contaminating information or influence [which] is certainly no grounds for disqualification of a judge." *Id.* at 159. Three judges, in a concurring opinion, concluded that the trial judge's statement that he had not learned of his wife's involvement until after the hearing so completely negated any reasonable question of impropriety that no further hearing was required. *Id.* at 162.

In the instant case, the time records of plaintiff's attorney, cryptically referring to "conference with judge", could reasonably warrant further inquiry. As in *Berry*, these entries show an "opportunity" for potential contamination. However, in contrast to *Berry* where no hearing was even required, defense counsel's sworn testimony and Judge Seier's assurances that the communications related only to procedural matters without any discussion concerning the merits of the cause, especially in light of no suggestion to the contrary, serve to dispel any further question of impropriety. Plaintiff relies upon disciplinary rule 7–110(B) of the Former Code of Professional Responsibility, which condemns communications between a lawyer and the presiding judge. Noticeably absent from plaintiff's citation is the phrase found within the former rule limiting censure to communications "as to the merits of the cause."

■ The arbitrary setting of trial and hearing dates, without regard for possible scheduling conflicts, results in confusion, delay, and the inefficient utilization of judicial time, a scarce commodity in this litigious age. Informal communication regarding available dates is commonplace, especially where a judge may be required to travel to an adjoining circuit. We find no more appearance of impropriety in such communication between a lawyer and a judge than in any other contact between them, be it during the trial of another case, a social encounter, or a chance meeting in the courthouse parking lot or on the street, all of which provide an "opportunity" for potential abuse. If such chance encounters or procedural communications were to mandate disqualification of a judge and nullification of his previous orders on the ground of an appearance of impropriety, the judicial process would come to a standstill. Accordingly, we reject plaintiff's contention that the ex parte communication between Judge Seier and defendants' attorney regarding purely procedural matters created an appearance of impropriety requiring the judge to disqualify himself and to vacate the orders of dismissal.

■ We also find no merit in plaintiff's contention that it is entitled to a mechanic's lien upon the private property adjoining the sewer line. The mechanic's lien statute, § 429.010 RSMo.1986, provides, in pertinent part,

any person who shall do or perform any work or labor upon, or furnish any material ... for any improvements upon land ... under or by virtue of any contract with the owner or proprietor thereof, or his agent, trustee, contractor or subcontractor, shall have for his work or labor done, or materials ... furnished, a lien upon ... the land belonging to such owner or proprietor on which the same are situated ...

A literal reading of the language of the statute would seem to limit the lien to the improvements and the land upon which the work was performed or the materials were furnished. However, as reviewed in *Ladue Contracting Co. v. Land Development Co.*, 337 S.W.2d 578 (Mo.App.1960), the courts have liberally construed this remedial statute to grant liens for certain improvements such as sidewalks and sewers constructed appurtenant to the land and installed pursuant to one entire contract for improvements upon the adjoining land, and in cases of construction partially upon

and partially adjoining the involved land. In 1909, the Missouri General Assembly enacted the predecessor of the present section 429.020 RSMo.1986, expressly granting a lien upon adjoining land for the construction of an abutting sidewalk. The purpose of this enactment, as concluded by the Ladue Contracting court was to eliminate the "entire contract" requirement insofar as sidewalk construction was concerned. *Id.* at 584. The court rejected the argument that the statute was intended to repudiate earlier decisions except as to sidewalks and granted the lien for street construction pursuant to one entire contract for the construction of residences, streets, curbs and sewers in a subdivision development. One year after this decision, section 429.020 was enacted in its present form extending lien rights against the land adjacent to, along or adjoining the construction of a street, curb, sidewalk, sewer line, water line, or pipe line.[3]

It is pursuant to this statute that plaintiff lays claim to a lien upon the private property adjacent to, along, or adjoining the sewer construction. However, the statute sets forth as a prerequisite to the right of a lien that the work be performed or the materials be furnished "under or by virtue of any contract with the owner or proprietor of such lot, tract or parcel of land, or his agent, trustee, contractor or subcontractor." Acknowledging that it has no contract with the landowners or their agents, contractors or subcontractors, plaintiff focuses upon the word "trustee" and argues that the city, having accepted funds for the express and limited purpose of constructing a sewer system, became the trustee for the landowner beneficiaries. Plaintiff points to the language of the EPA and the DNR assistance agreements referring to the funding as a "grant", the City as the "grantee", and the funding agency as "grantor". Plaintiff also cites 40 C.F.R. 30.309(b), which states that "the award of an assistance agreement constitutes a public trust." Although the words plaintiff seizes upon are utilized in connection with

the fiduciary relationship denominated in legal parlance as a trust, the words also are subject to common usage without meaning or connotation of any technical relationship enforceable at law or equity. "In common parlance, to be in a position of 'trust' or to be a 'trustee' often means merely to occupy a station where elements of confidence and responsibility exist. The one trusted in this sense ... is not necessarily in the technical trust relation." Bogert, Trusts, § 1 p. 2 (6th ed. 1987). Despite the use of the above terms, the language of the assistance agreements is not susceptible, even by strained construction, of expressing an intention to establish the type of fiduciary relationship which is the hallmark of a legal trust. Nor can these grant agreements be construed as investing the citizens of the city with any equitable interest in the fund. All funds received by a municipality, be it from taxes, fees, grants, sale of property, or whatever source, are held for the public benefit and, in some instances, are earmarked for use on a particular public project. However, a citizen or taxpayer has no right of action, as does the beneficiary of a trust, to compel a municipality to act, to impose liability upon a municipality for a breach of trust, to remove the municipality as trustee or to seek the appointment of a receiver to take possession of and to administer municipal property. *See,* Restatement (Second) Trusts, § 199 (1958). "While it is said that a municipal corporation holds all of its property in trust for public use none of its taxpayers or public have any private interest in its funds or property, but the interest that they have is a public one in common with all other taxpayers or members of its public." *Wheat v. Platte City Ben. Assessment Special R. Dist.,* 227 Mo.App. 869, 876, 59 S.W.2d 88, 91 (Mo.App.1933).

■ Moreover, the liens sought by plaintiff upon the private property of the defendants are intended to secure the alleged indebtedness of the City upon a public works contract. See § 290.210(7), RSMo.

---

**3.** Simultaneously, the Legislature enacted section 429.030, RSMo.1986, providing the entire tract of land, not just the part covered by a portion of the improvement, be subject to the lien.

1986. The Missouri Constitution, Art. X, § 9, provides "[p]rivate property shall not be taken or sold for the payment of the corporate debt of a municipal corporation." Consequently, § 429.020 RSMo.1986 cannot be construed as authorizing a lien upon private property pursuant to a public works contract entered into by a municipality; such a lien would allow the taking of private property to satisfy the corporate debt of a municipal corporation.

Having concluded that under the facts and the Missouri Constitution plaintiff is not entitled to a mechanic's lien upon the defendants' private property, we need not address the issue relating to the sufficiency of the notice of lien under section 429.012, RSMo.1986.

█ Finally, plaintiff contends the trial court erred in dismissing Counts II and III under the prior claim pending doctrine. VAMR 55.27(a)(10). However, these claims were dismissed without prejudice. Plaintiff is free to re-file its claim for breach of contract or quantum meruit. *Brunton v. Floyd Withers, Inc.,* 716 S.W.2d 823, 825 (Mo.App.1986).[4] Consequently, this is not a final appealable order. *Karney v. Wohl,* 747 S.W.2d 214 (E.D.Mo.App.1988); *Davis v. Poetz,* 712 S.W.2d 68, 70 (Mo.App.1986); *Nicholson v. Nicholson,* 685 S.W.2d 588, 589 (Mo.App.1985).

Accordingly, we affirm the trial court's December 12, 1986, order in all respects. Plaintiff's appeal from the dismissal of Counts II and III of its amended petition is dismissed.[5]

SATZ, C.J., and SIMEONE, Senior Judge, concur.

---

**4.** We are told the allegations of plaintiff's third party petition against the City filed in an action pending in the St. Louis County Circuit Court, to the extent they seek the same relief against the City as in this case, were ordered stricken in March 1987, as being beyond the scope of third party practice.

---

This later ruling has no effect upon our review of the December 12, 1986, order of dismissal. *See Brown v. Stroeter,* 263 S.W.2d 458, 462 (Mo. App.1953).

**5.** Defendants' motion for damages under Rule 84.19 is denied.